**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (DAYTON)**

APEX TOOL GROUP, LLC,     :

                           :

Plaintiff,                :

                           :             Civil Action No. 3:13cv00372

v.                      :

                           :                 Judge Thomas M. Rose

DMTCO, LLC, et al.       :      Magistrate Judge Michael R. Merz

                           :

Defendants.             :

**PLAINTIFF APEX TOOL GROUP, LLC'S RESPONSE IN OPPOSITION TO**
**DEFENDANT EQUIPMENT GROUP INVESTMENTS, LTD'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR DISMISSAL**

      Plaintiff Apex Tool Group, LLC ("Apex") files this response in opposition to Defendant Equipment Group Investments, LTD.'s ("EGI") Motion for Judgment on the Pleadings and/or for Dismissal for Plaintiff's Failure to State a Claim Upon Which Relief Can Be Granted (the "Motion").

## I.    Introduction

      Apex's Complaint asserts claims against three former employees of Apex's predecessor in interest – Cooper Tools: Duane Newland ("Mr. Newland"), Malcolm Lovelace ("Mr. Lovelace"), and Tony Stevens (Mr. Stevens)(collectively "Individual Defendants"), and against DMTCO, LLC ("DMTCO"), a company Individual Defendants launched to unlawfully compete with Apex's Airetool product line. Apex also asserts claims against EGI, a Texas-based distributor and Airetool competitor, who, among other things, contributed essential funding, marketing, and distribution support to DMTCO when it knew or should have known that the "identical" knock-off product was manufactured using trade secret and confidential information Individual Defendants misappropriated while employed at the Airetool plant in Ohio.

The Motion filed by EGI seeks an early dismissal so that EGI may evade discovery, where additional evidence of EGI's liability will be revealed.  The Motion should be denied because Apex properly pled its claims since, viewing the Complaint as a whole, the allegations provide fair notice of each claim asserted against EGI and of the grounds upon which each claim rests.

## II.     <u>Statement of Facts</u>

Airetool® is an industry-leading brand established in 1929.  Over the course of many years, as a result of substantial financial investment and research, development, invention, testing, product design, improvement of manufacturing methods, and marketing of the Airetool product line, the Airetool brand is widely recognized as an industry-leading brand known for its innovation and quality. <u>See</u> Compl., Doc. No.1, PageID 5 (¶¶20 and 23-24).

As a result of their employment with Apex's predecessor in interest, Cooper Tools, Individual Defendants were entrusted with and enjoyed access to valuable confidential, trade secret, and proprietary information related to the Airetool product line, which now belongs exclusively to Apex. <u>See</u> Compl., Doc. No.1, PageID 5,6 (¶¶25-27).

On July 29, 2009, several months before each of them successively terminated their employment with Cooper Tools, and while they were still employed at the Airetool plant, Individual Defendants formed a competing company, DMTCO, as a direct competitor of the Airetool brand. Importantly, the formation of DMTCO occurred in the summer of 2009, around the same time Cooper Tools consolidated its Airetool plant in Springfield, Ohio, with its Dayton plant. The consolidation required the massive transfer of Cooper Tools' equipment, inventory, and intellectual property to the Dayton plant,

some of which, including computers, programming, and tools, were missing after the move. See Compl., Doc. No.1, PageID 7,8 (¶¶31, 32, 34, 37, 39, 40).

Individual Defendants transferred from the Springfield plant to the Dayton plant in connection with the consolidation. In fact, Mr. Lovelace, as Plant Manager of the Airetool plant in Springfield, was in charge of the entire move. With the benefit of his position of trust and confidence, and his comprehensive, working knowledge of and access to high level trade secret and confidential information, Mr. Lovelace upon information and belief misappropriated trade secret and confidential business information ("Protected Information"), which was later used by Defendants to accelerate the launch of DMTCO and to divert Airetool customers and sales to DMTCO and/or EGI. Additionally, during the move, Mr. Lovelace returned some of Cooper Tools' missing equipment under suspicious circumstances. However, other equipment, including, for example, a computer program and its operating hardware, remains missing. Similarly, with the benefit of Airetool programming, upon information and belief, Mr. Newland quickly set up manufacturing equipment at DMTCO's manufacturing facility to immediately begin production of knock-off Airetool products." See Compl., Doc. No.1, PageID 7,8 (¶¶31, 33, 35-38, 43).

Individual Defendants conspired with EGI to obtain funding and other assistance to launch DMTCO and to distribute and sell DMTCO's knock-off Airetool products. In furtherance of their common scheme, Defendants used Apex's misappropriated Protected Information. See Compl., Doc. No.1, PageID 7, 9 (¶¶36, 43, 49).

In an effort to capture Airetool sales from Plaintiff's customers once DMTCO was operational, representatives of EGI and/or DMTCO represented to customers that EGI's U.S.-based manufacturer is producing product **identical** to the Airetool product line, and such representatives even went on to encourage Airetool customers to test DMTCO's

new products against Airetool's products to confirm it. See Compl., Doc. No.1, PageID 10 (¶¶55-56)(emphasis added).

Apex historically fared well in competition with EGI, which had previously been without a U.S. supplier and only distributed product made exclusively by a Polish manufacturer Apex believes is known by customers for making inferior product. However, in 2010, Apex obtained a tube expander mandrel stamped "Made in the USA," which Apex is informed and believes was made by DMTCO and distributed by EGI. Indeed, subsequent testing revealed that EGI's new "Made in the USA" mandrel was identical from a dimensional, tolerance, and materials perspective, with only minor inconsequential differences." Compl., Doc. No.1, PageID 10 (¶¶51 and 52).

Company technical experts uniformly believe it would be impossible, even for a former employee, to manufacture identical product without having the proprietary designs from Apex. Around the time that Apex first discovered EGI's new "Made in the USA" product was identical to the Airetool product, Apex confirmed directly from an EGI representative that EGI's entire product line of "Made in the USA" products could already be ordered, leading Apex to believe Defendants possess the prints and designs for the entire Airetool product line. Later in 2010, Apex detected a subsequent "sharp decline" in its sales of the same Airetool products believed to be the focus of DMTCO's initial competitive manufacturing. See Compl., Doc. No.1, PageID 10-11 (¶¶53, 60-61).

### III.    Standard of Review

Apex's Complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief" and it 'need not allege specific facts'." MedChoice Fin., LLC v. ADS Alliance Data Sys., Inc., 857 F. Supp. 2d 665, 670 (S.D. Ohio 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 550

(2007)).  To be well-pled, Apex's Complaint must simply  "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Medchoice, 857 F. Supp. 2d at 670 (citing Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal citations omitted)).

When evaluating the sufficiency of pleadings, the Court should "view the complaint as a whole and view each individual allegation in the context of the entire complaint." MedChoice, 857 F. Supp. 2d at 670.  The Court should deny a motion for judgment on the pleadings where "drawing all reasonable inferences from the relevant record in favor of the non-movant, there is a genuine issue of any material fact." Lavado v. Keohane, 992 F.2d 601, 610-11 (6th Cir. 1993); see Reed Elsevier, Inc. v. Thelaw.Net Corp., 269 F.Supp.2d 942 (S.D. Ohio 2003). In addition, "all well-pleaded material allegations of the pleadings of the [non-movant] must be taken as true." Lavado, 992 F.2d at 605, quoting Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir.1973).

## IV.    Argument

**A.    The Court Should Deny EGI's Motion For Judgment on the Pleadings Because the Claims Asserted Against EGI Are Well-pled.**

None of EGI's challenges to the Complaint warrant judgment on the pleadings or dismissal, as demonstrated below.

### 1.    Apex's Complaint creates more than speculation or suspicion of a legally cognizable cause of action.

Citing no law to support its preferred method, beginning at Paragraphs 5 through 15 of the Motion, EGI leads this Court to consider separately, and in isolation, individual allegations in the Complaint to determine if Apex adequately pled a basis for holding EGI liable, generally. See Motion to Dismiss, Doc. No.22, PageID 126-130 (¶¶5-15). The Court should reject EGI's approach because it contravenes this Court's duty to ". . . view the complaint as a whole and view each individual allegation in the context of the entire complaint."

MedChoice Fin., LLC v. ADS Alliance Data Sys., Inc., 857 F. Supp. 2d 665, 670 (S.D. Ohio 2012). Viewing the Complaint in its entirety, Apex sufficiently pled its claims against EGI, as shown below.

### a. Allegations made "upon information and belief" are sufficient.

EGI's attack of individual allegations in the Complaint in isolation on grounds that they are speculative because they are stated "on information and belief" ignores well established law holding that a "[p]laintiff is entitled to allege certain facts upon information and belief." See C.J.S. Pleading § 139. EGI does not cite any authority for its argument that alleging facts "upon information and belief" somehow renders them facially speculative or ambiguous. See Motion to Dismiss, Doc. No.22, PageID 126-129 (¶¶6, 7, 9, 11, and 12).

EGI fails to cite to any legal authority for disregarding allegations pled "on information and belief." However, pleading the existence of personal jurisdiction "on information and belief" is permitted. See, e.g., Palnik v. Westlake Entertainment, Inc., 344 Fed.Appx. 249, 252-253 (6th Cir. 2009) (A party and her attorney can, on "knowledge, information, and belief . . ." allege the existence of personal jurisdiction "[a]nd such an assertion will be assumed true for the purposes of the party's prima facie case for jurisdiction 'notwithstanding ... contrary assertions' from the defendant.").[1]

Likewise, federal courts regularly hold that it is appropriate and sometimes necessary for a plaintiff to plead a trade secret claim "on information and belief". See, e.g., Lumenate Technologies, LP v. Integrated Data Storage, LLC, Case No. 13 C 3767, 2003 WL 5974731 (N.D. Ill. Nov. 11, 2013) (holding trade secret claim properly pled

---

[1] While Apex believes that the Complaint viewed in its entirety provides adequate notice that Apex has (or can have after additional discovery) evidentiary support for its personal jurisdiction allegation, Apex respectfully requests leave to amend if the Court determines additional information should be alleged.

although some allegations pled on information and belief); <u>Alpha Pro Tech, Inc. v. VWR Intern. LLC</u>, 984 F.Supp.2d 425 (E.D. Pa. Nov. 26,2013) (holding trade secret claim sufficiently pled though allegations pled on information and belief); <u>TMX Funding, Inc. v. Impero Technologies, Inc.</u>, No. C 10–00202 JF (PVT), 2010 WL 2509979 (N.D. Cal. June 17, 2010) (holding plaintiff sufficiently pled trade secret claim where use of trade secrets alleged on information and belief; <u>nexTUNE, Inc. v. McKinney</u>, No. C12-1974 TSZ, 2013 WL 5211778 (W D. Wash. Sept. 17, 2013) (holding plaintiff sufficiently pled trade secret claim even though use of the trade secrets was alleged on information and belief; <u>GTSI Corp. v. Wildflower Int'l, Inc.</u>, No. 1:09cv123 (JCC), 2009 WL 1248114 at *7 (E.D. Va. April 30, 2009) (holding trade secret claim pled on information and belief is sufficient and "not fatal to [plaintiff's] claim").

Even by the time of the trial "[of] most [trade secret misappropriation] cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place." <u>Lumenate</u>, 2013 WL 5974731 at *5 (quoting <u>PepsiCo, Inc. v. Redmond</u>, No. 94 C 6838, 1996 WL 3965, at *15 (N.D. Ill. Jan. 2, 1996)).  Accordingly, in most trade secret cases, it is necessary and appropriate to plead allegations on information and belief because the plaintiffs are not usually in a position to have direct knowledge of all of a defendant's actions. <u>See id.</u>

### b.  Apex sufficiently pled a basis for its entitlement to relief from EGI.

EGI's attack of specific allegations in the Complaint in isolation ignores the cumulative support offered by the Complaint as a whole. Viewed in its entirety, Apex's Complaint sufficiently alleges grounds for Apex to seek relief from EGI.

First, Apex's Complaint specifically alleges, among other things, that in an effort to capture Airetool sales from Plaintiff's customers once DMTCO was operational, representatives of EGI and/or DMTCO represented to customers that EGI's U.S.-based manufacturer is producing product **identical** to the Airetool product line, and such representatives even went on to encourage Airetool customers to test DMTCO's new products against Airetool's products to confirm it. See Compl., Doc. No.1, PageID 10 (¶¶55-56) (emphasis added).  These "identical" product representations to customers, combined with bold encouragement for the customers to perform testing to confirm that the DMTCO product was identical, reflects EGI's confident knowledge that even with independent testing, DMTCO's products would be deemed "identical."

Allegations of EGI's confident knowledge that DMTCO's products were "identical" must also be viewed in light of the entirety of the remainder of the Complaint. For example, Apex specifically pled that "Defendants" used the misappropriated Protected Information. Compl., Doc. No.1, PageID 7 (¶36).  Apex also alleged EGI's specific role in Defendants' common scheme: Individual Defendants conspired with EGI "to obtain funding and other assistance for the launch of DMTCO and for the marketing, distribution, and sale of the DMTCO-manufactured knock-off Airetool products in direct competition with Plaintiff." Compl., Doc. No.1, PageID 9 (¶49). These allegations of EGI's specific role further support a finding that EGI made "identical" product representations, as these additional facts show that the "marketing, distribution, and sales" arm of Defendants' common scheme was EGI.

Adequate grounds for Apex's entitlement to relief from EGI is further supported by additional allegations in Apex's Complaint, including, without limitation, the following: (1) EGI had not fared well in competition with Airetool when it distributed inferior

competitive products that were not "Made in the USA"; (2) when Apex first discovered a "Made in the USA" mandrel manufactured by DMTCO and distributed by EGI, Apex had it tested and discovered EGI's new "Made in the USA" product was "identical from a dimensional, tolerance, and materials perspective, with only minor inconsequential differences"; (3) about the same time, Apex confirmed directly from an EGI representative that EGI could already produce the "entire" product line of its "Made in the USA" product. See Compl., Doc. No.1, PageID 10 (¶¶51-53). Such allegations reasonably support Apex's belief that EGI had a motive to join DMTCO in Defendants' common scheme; historically, EGI's traditional product line was not U.S.-made and had not fared well in competition with Airetool because customers viewed the products as inferior to Airetool products. EGI gained a competitive advantage by providing funding, marketing, and distribution to launch and support DMTCO. EGI could readily market the knock-off product line with greater success since EGI's new product line could be readily distinguished from its traditionally inferior product by the new "Made in the USA" stamp, and customers could test it to confirm that EGI's new product line was indeed "identical."

The above allegations provide a basis for finding that about the same time EGI's first "identical" knock-off product appeared on the market in 2010, EGI represented to Apex that EGI's entire "Made in the USA" product line was already available. Such additional facts support Apex's belief that, already by this time in 2010, EGI had access to all of the proprietary Airetool product line designs. This belief is further supported by the allegation that, in 2010, Apex detected a subsequent "sharp decline" of its sales of the products believed to be the focus of DMTCO's initial competitive manufacturing. Compl., Doc. No.1, PageID 11 (¶61). Indeed, Apex's allegation of this "sharp decline" of Apex's sales of these products in 2010, supports Apex's further belief that Defendants'

common scheme was not limited to the original mandrel, but instead extended to all of Apex's Airetool products. That all of EGI's new products were being produced using Apex's misappropriated designs is further supported by Apex's allegation that: "**Company technical experts uniformly believe it would be impossible, even for a former employee, to manufacture identical product without having the proprietary designs of Apex**." Compl., Doc. No.1, PageID 11 (¶¶60-61)(emphasis added). Notably, this allegation also provides additional grounds for Apex's claim that EGI knew or should have known the "identical" knock-off products marketed, distributed, and sold by EGI were manufactured by DMTCO using Apex's proprietary designs.

As demonstrated above, considering Apex's Complaint in its entirety, Apex sufficiently pled a basis for EGI's liability, and the adequacy of Apex's pleading of specific claims is further established below.

> **2.    Apex properly alleged an unlawful act sufficient to support its civil conspiracy claim.**

The elements of a civil conspiracy are: (i) a malicious combination of (ii) two or more persons, (iii) resulting in injury to person or property, and (iv) existence of an unlawful act independent of the conspiracy.  See Universal Coach, Inc. v. New York City Transit Authority, Inc., 90 Ohio App. 3d 284, 292, 629 N.E.2d 28 (8th Dist. 1993); see also, Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419 (1995). Apex alleged each element with sufficient facts to properly plead a civil conspiracy claim.

> **a. A malicious combination of two or more persons**

Apex alleged that all Defendants "acted together, in concert to commit one or more of the acts complained of herein." Compl., Doc. No.1, ¶¶86-87.   Additional supporting facts alleged, include, but are not limited to:

(a)    ". . .Mr. Lovelace . . . misappropriate[d] trade secret and confidential business information, which was later used by Defendants to accelerate the launch of DMTCO and to divert Airetool customers and sales to DMTCO and/or EGI." Compl.,Doc. No.1, PageID  7 (¶36).

(b)    "With the benefit of Airetool programming, Mr. Newland . . . quickly set up manufacturing equipment at DMTCO's manufacturing facility to immediately begin production of knock-off Airetool products." Compl., Doc. No.1, PageID  9 (¶43).

(c)    "A computer program and its operating hardware that Mr. Newland used to program a tool from one machine to another has been missing since the move. [O]ne or more of the Individual Defendants stole the computer program and operating hardware so that they could use it for the benefit of DMTCO's unfair competition scheme." Compl., Doc. No.1, PageID 8 (¶38).

(d)    ". . . Individual Defendants conspired with Defendant EGI to obtain funding and other assistance for the launch of DMTCO and for the marketing, distribution, and sale of the DMTCO-manufactured knock-off Airetool products in direct competition with Plaintiff." Compl., Doc. No.1, PageID  9 (¶49).

(e)    "About this same time, an Apex employee called the support number on EGI's website and was told that . . . EGI's entire product line could now be ordered to be 'made in the USA', which suggests that Defendants possess the prints and designs for the entire Airetool product line." Compl., Doc. No.1, PageID 10 (¶53).

(f)    "[R]epresentatives of EGI and/or DMTCO have represented to customers that EGI's U.S.-based manufacturer is producing product identical to the Airetool product line." Compl., Doc. No.1, PageID 10 (¶56).

(g)    In 2010, there was a "sharp decline in Apex's sale of the products believed to be the focus of DMTCO's initial competitive manufacturing." Compl., Doc. No.1, PageID 11 ("¶61).

(h)    "Company technical experts uniformly believe it would be impossible, even for a former employee, to manufacture identical product without having the proprietary designs of Apex."  Compl., Doc. No.1, PageID 11 (¶60).

Based on these facts, and certainly when they are viewed in light of the Complaint in its entirety, Apex has sufficiently pled a basis for the following: (1) Mr.

Lovelace, who had access to Apex's Protected Information, stole Apex's Protected Information and shared it with the other Defendants so they could speed the launch of DMTCO; (2) Mr. Newland or one of the other Individual Defendants stole Apex's computer program and its operating hardware for DMTCO's use, (3) EGI helped fund and launch DMTCO knowing that it would produce products using Apex's Protected Information; (4) EGI and the other Defendants possess Apex's Protected Information; and (5) EGI knew or should have known DMTCO's identical product was produced unlawfully using Apex's Protected Information.   Because Apex pled that Defendants acted in concert and pled facts in support of that element, Apex properly alleged the first two elements of a civil conspiracy claim. See Universal Coach, 90 Ohio App. 3d, at 292.

### b. Resulting in injury to the person or property

Apex further pled that "[a]s a proximate result of Defendants' conspiracy, Plaintiff has been damaged."  Compl., Doc. No.1, PageID 16 (¶92). In support of this allegation, Apex pled supporting facts, including, but not limited to:

> (a)    "Bolstering the initial product testing is evidence of a sharp decline in Apex's sale of the products believed to have been the focus of DMTCO's initial competitive manufacturing efforts in 2010." Compl., Doc. No.1, PageID 11( ¶61).

> (b)    ". . .EGI is continuing to service customers and business relationships obtained unlawfully through its conspiracy with DMTCO; in fact, EGI may still be using knock-off Airetool product manufactured either by DMTCO or Does 1 through 10. . . ."Compl., Doc. No.1, PageID 12 (¶63).

These facts provide sufficient grounds for finding that: 1) once EGI began distributing knock-off products manufactured by DMTCO using Apex's misappropriated Protected Information, Apex's sale of those same products declined sharply as a result, and 2) there remains a threat that EGI may continue selling the knock-off product and

thereby cause additional harm to Apex.

Because Apex pled that Defendants' actions injured it and pled facts in support of that element, Apex properly alleged the third element of a civil conspiracy claim. See Universal Coach, 90 Ohio App. 3d, at 292.

### c. The existence of an unlawful act independent of the conspiracy

Apex alleged that "Defendants conspired to accomplish an unlawful purpose, i.e., . . . the misappropriation, disclosure, and/or use of confidential information and trade secrets of Plaintiff's predecessor in interest. . . ." Compl., Doc. No.1, PageID 16 (¶88). In support of this allegation, Apex offered supporting facts, including, but not limited to:

> (a)     "With the benefit of his position of trust and confidence, and his comprehensive, working knowledge of and access to such high level trade secret and confidential information, Mr. Lovelace . . . misappropriate[d] trade secret and confidential business information, which was later used by Defendants to accelerate the launch of DMTCO and to divert Airetool customers and sales to DMTCO and/or EGI." Compl., Doc. No.1, PageID 7 (¶36).

> (b)     "With the benefit of Airetool programming, Mr. Newland. . . quickly set up manufacturing equipment at DMTCO's manufacturing facility to immediately begin production of knock-off Airetool products." Compl., Doc. No.1, PageID 9 (¶43).

> (c)     ". . . Individual Defendants conspired with Defendant EGI to obtain funding and other assistance for the launch of DMTCO and for the marketing, distribution, and sale of the DMTCO-manufactured knock-off Airetool products in direct competition with Plaintiff." Compl., Doc. No.1, PageID 9 (¶49).

> (d)     "About this same time, an Apex employee called the support number on EGI's website and was told that. . . EGI's entire product line could now be ordered to be 'made in the USA', which suggests that Defendants possess the prints and designs for the entire Airetool product line." Compl., Doc. No.1, PageID 10 (¶53).

> (e)     "More exhaustive product testing confirms initial suspicions that DMTCO has been manufacturing product nearly identical to Airetool. In fact, all testing to date confirms the Company's belief that DMTCO has been producing identical products, with minor

inconsequential exceptions." Compl., Doc. No.1, PageID 11 (¶59).

These facts provide sufficient grounds for finding that: 1) EGI possesses Apex's Protected Information (improperly acquired through Mr. Lovelace and Mr. Newland), 2) EGI helped launch DMTCO *for the purpose* of producing knock-offs manufactured using Apex's Protected Information, so that it could compete with Apex, and 3) EGI has used the Protected Information.

Because Apex pled unlawful acts independent of the conspiracy (improper conversion, acquisition, and use of Protected Information and other property), and pled facts in support of that element, Apex properly alleged the fourth element of a civil conspiracy claim. See Universal Coach, 90 Ohio App. 3d, at 292.

### d. Apex's allegations meet the specificity requirements for well-pled civil conspiracy claims.

Civil conspiracy claims "must be pled with some degree of specificity." Avery v. Rossford, Ohio Transp. Improvement Dist., 145 Ohio App. 3d 155, 165, 762 N.E.2d 388 (6th Dist. 2001). Plaintiffs satisfy this requirement by alleging facts such as: (i) defendant acted in concert, (ii) how defendant acted in concert, (iii) when defendant acted in concert, (iv) what specific actions were taken in concert, (v) where defendant acted in concert, and (vi) how the alleged conspiracy resulted in damages. See Advanced Coatings Intern., Inc. v. Florida CirTech, Inc., No. 5:11CV2107, 2012 WL 3067375, *4 (N.D. Ohio July 27, 2012); Coley v. Lucas Co. Ohio, No. 3:09 CV 8, 2014 WL 273235, *9 (N.D. Ohio Jan. 23, 2014); see also, Meadows v. Trumbull County Health Dept., No. 4:12CV02279, 2013 WL 1819223, *8 (N.D. Ohio  Apr. 29, 2013).

Apex's Complaint alleges the kinds of facts that support the heightened specificity standard. They include, but are not limited to:

a) **Action in concert-** EGI and Individual Defendants agreed that EGI would fund and

assist in the launch of DTMCO which would produce products using Apex's Protected Information. See Compl., Doc. No.1, PageID 9, 11-12 (¶¶49, 57-58, 63, and first unnumbered paragraph);

**b) How defendant acted in concert-** Defendants used Apex's Protected Information to accelerate the launch of DMTCO. See Compl., Doc. No.1, PageID 7, 10-11 (¶¶36, 43, 53, 55-58);

**c) Specific actions taken in concert-** Defendants possession and use of Apex's Protected Information. See Compl., Doc. No.1, PageID 9-11 (¶¶ 49, 53, 55-58);

**d) When action in concert occurred-** Between DMTCO's founding on July 29, 2009 and EGI's funding agreement and alignment with EGI regarding Apex's accelerated launch. See Compl., Doc. No.1, PageID 7-10 (¶¶ 36, 40, 48, 49, 53);

**e) Where defendant acted in concert-** Ohio. See Compl., Doc. No.1, PageID 4 (¶15); and

**f) How conspiracy resulted in damages-** Apex noted a sharp decline in its sales. See Compl., Doc. No.1, PageID 11 (¶61).

Having alleged appropriate supporting facts, Apex's Complaint satisfies the heightened specificity requirements of its civil conspiracy claim.

> **3.     Apex's misappropriation of trade secrets claim is well-pled.**
>
> **a.  Apex alleges sufficient facts to support its misappropriation of trade secrets claim against EGI.**

"The elements of a claim for misappropriation of trade secrets are: (1) the existence of a trade secret; (2) acquisition of the trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." Kuvedina, LLC v. Cognizant Tech. Solutions, 946 F. Supp. 2d 749, 755 (S.D. Ohio 2013) (quoting Hoover

<u>Transp. Servs., Inc. v. Frye</u>, 77 Fed. Appx. 776, 782 (6th Cir. 2003); Ohio Rev. Code § 133[3].61). A third party who receives improperly acquired trade secrets can be held liable for misappropriation (despite having no direct relation) to the trade secret owner if it "should have known" its co-defendant disclosed improperly acquired trade secrets to it. <u>Mar Oil Co. v. Korpan</u>, No. 3:11CV1261, 2014 WL 2986907, *9 (N.D. OH Apr. 18, 2014).

Apex not only alleged the prima facie elements of its trade secrets misappropriation claim, <u>See</u> Compl., Doc. No. 1, PageID 12-13 (¶¶ 64-74), but, in further support of Apex's allegations, it also alleged:

(a) **Existence of Trade Secret-** During the course of their employment, ". . . Individual Defendants had access to valuable, proprietary, trade secret, and confidential business information . . . that now belongs exclusively to Plaintiff, including . . . Information for the entire Airetool product line: product design drawings, specifications and programming, manufacturing materials and processes, sales histories and strategies, business opportunities, and customer, vendor and pricing information.

(b) **Acquisition through Confidential Relationship and Use-** ". . . Mr. Lovelace . . . misappropriate[d] trade secret and confidential business information, which was later used by [all] Defendants to acceleration the launch of DMTCO . . . ."

(c) **Acquisition through Confidential Relationship-** ". . . Individual Defendants conspired with Defendant EGI to obtain funding and other assistance for the launch of DMTCO and for the . . . sale of . . . knock-off Airetool products . . . ."

Compl., Doc. No.1, PageID 5-7, 9 (¶¶ 25, 36, 49).

Having asserted facts supporting each element of the misappropriation of trade secrets claim against EGI, Apex has sufficiently pled the claim. <u>Kuvedina</u>, 946 F. Supp. 2d at 756.

### b. The Confidentiality Agreements do not bar Apex's claims.

Apex specifically pled that **Apex**, which was formed in July 2010 as a joint venture by Danaher Corporation and Cooper Industries plc., "**is the successor in**

**interest to the assets, liabilities and contracts of various tool business subsidiaries** of Danaher Corporation and Cooper Industries **including, but not limited to those of Cooper Tools, ... which is now a wholly-owned subsidiary of Apex**..." Compl., Doc. No.1, PageID 2-3 (¶3)(emphasis added). Thus, Apex pled sufficient grounds to assert its claims as the successor in interest.

The fact that EGI is not a party to Individual Defendants' Confidentiality Agreements is also of no consequence. Nowhere in its Complaint does Apex assert a claim against EGI for violating the Confidentiality Agreements. Inasmuch as a misappropriation of trade secrets claim requires the existence of a trade secret, the existence of such agreements is one way to demonstrate reasonable efforts to maintain the secrecy of Apex's Protected Information. Kuvedina, 946 F. Supp. 2d at 755-56; Compl., Doc. No.1, PageID 5,6 (¶¶25, 28). Moreover, Apex's misappropriation claim is based on violation of the trade secret *statute,* Ohio Uniform Trade Secrets Act, Ohio Rev. Code Ann. § 1333.61, et seq., not the Confidentiality Agreements. See Compl., Doc. No.1, PageID 13 (¶72). As noted in section IV(A)(3)(a) above, Apex has properly pled facts supporting that statutory claim.

### c. Apex is not required to prove EGI's knowledge of the Agreements

Apex need not allege that EGI knew of the Agreements. Instead, Apex may base its theory of liability against EGI on its allegations that EGI *knew or should have known* that Individual Defendants acquired Apex's trade secrets by improper means. See Mar Oil, 2014 WL 2986907, *9. Apex discussed its specific allegations regarding this issue in sections IV(A)(1)(b) and IV(A)(3)(a) supra. Therefore, EGI's assertion that "Apex fails to articulate how EGI would know of [the Agreements]" misses the point and should be disregarded. See Motion to Dismiss, Doc. No.22, PageID 132 (¶23).

Because Apex has sufficiently alleged each of the elements and supporting facts for its trade secret misappropriation claim, EGI's motion to dismiss that count should be denied. See Kuvedina, 946 F. Supp. 2d at 756 (S.D. Ohio 2013).

**4. Apex properly alleged civil conversion because it alleged that EGI converted confidential information, product design drawings, manufacturing materials, tools, equipment and other property.**

Apex pled sufficient supporting facts for its civil conversion claim. The elements of civil conversion are: a) plaintiff's ownership or right to possess the property at the time of the conversion, b) defendant's conversion by a wrongful act or disposition of Plaintiff's property, and c) damages. Id. at 761 (citing In re McWeeney, 255 B.R. 3, 5 (S.D. Ohio 2000) (citing Haul Transport of VA, Inc. v. Morgan, No. CA 14859, 1995 WL 328995, *3–4 (Ohio Ct. App. June 2, 1995)).

Among the facts Apex alleges to support a conversion claim against EGI are the following:

i) **Plaintiff's ownership-**
   a. "During the course of their employment with Plaintiff's predecessor in interest, Cooper Tools, now a part of Apex Tool Group, Individual Defendants had access to valuable, proprietary, trade secret, and confidential business information (collectively, "Protected Information") **that now belongs exclusively to Plaintiff**, including but not limited to the following types of Protected Information for the entire Airetool product line: **product design drawings**, specifications and programming, **manufacturing materials** and processes, sales histories and strategies, business opportunities, and customer, vendor and pricing information."

   b. "**Computers, programming**, and certain **equipment and tools** that reasonably should have transferred were missing after the move to [Apex's] Dayton Plant."

   c. "A **computer program and its operating hardware** that Mr. Newland used to program a tool from one machine to another has been missing since the move."

ii) **Defendant's conversion-**
   a. "With the benefit of his position of trust and confidence, and his comprehensive, working knowledge of and access to such high level trade secret and confidential information, **Mr. Lovelace** could, and upon information and belief **did, misappropriate trade secret and**

      **confidential business information, which was later used by Defendants to accelerate the launch of DMTCO and to divert Airetool customers and sales to DMTCO and/or EGI."**

    b.  "Since terminating their employment with Cooper Tools, Individual Defendants have been continuously employed by and acting for the benefit of DMTCO manufacturing products that are competitive to Airetool products **using prints and designs and other property misappropriated from Apex Tool Group."**

  iii)  **Defendant's conversion-** "Individual Defendants conspired with Defendant EGI to obtain funding and other assistance for the launch of DMTCO and for the marketing, distribution, and sale of the DMTCO-manufactured knock-off Airetool products in direct competition with Plaintiff."

  iv)  **Damages-** "Bolstering the initial product testing is evidence of a sharp decline in Apex's sale of the products believed to have been the focus of DMTCO's initial competitive manufacturing efforts in 2010."

Compl., Doc. No.1, PageID 5, 7-8, 10-11 (¶¶25, 36-38, 42, 49, 53, 61) (emphasis added).

      Next, Apex alleged adequate grounds to infer that EGI exercised dominion over both Apex's intellectual *and* tangible property. These facts include, but are not limited to:

  i). . . [EGI] used Apex's trade secrets and confidential business information to accelerate the launch of DMTCO and to divert Airetool customers and sales to DMTCO and/or EGI.

  ii) . . . [EGI possesses] the prints and designs for the entire Airetool product line.

  (iii) Through their conduct described above, Defendants have . . . converted property owned by Plaintiff to their own use, or to the use of DMTCO and/or EGI, including but not limited to certain tools, equipment, inventory, and/or tangible confidential information such Airetool product design prints or drawings or other tangible confidential information.

Compl., Doc. No. 1, PageID 7, 10, 15 (¶¶36, 53, 82). Having sufficiently alleged each of the elements and supporting facts for its civil conversion claim, EGI's motion to dismiss that count should be denied. <u>Freedom Banc Mortg. Services, Inc. v. O'Harra</u>, No. 2:11–

cv–01073, 2012 WL 3862209, *3,*10 (S.D. Ohio Sept. 5, 2012). (Where there exist allegations "sufficient to support the inference that Defendants were exercising dominion over Plaintiff's [property]" when viewed in the light of the "entire complaint," dismissal of a conversion claim is inappropriate.); see Columbus Midway, Inc. v. Holtz, 3378, 1988 WL 142304, *2 (Ohio Ct. App. Dec. 29, 1988) (defendants' conversion of the property of plaintiff "need not have occurred simultaneously").

**V.      Conclusion**

Apex pled sufficient facts to support its claims against EGI, giving EGI fair notice of each claim and the grounds upon which those claims rest.[2] Accordingly, Apex respectfully requests that the Court deny EGI's Motion in its entirety.

This 22nd day of August, 2014.

Respectfully submitted,

/s/ Timothy G. Pepper                           /s/ J. Kellam Warren
Timothy G. Pepper (0071076)           J. Kellam Warren, admitted Pro Hac Vice
Trial Attorney                                       MAINSAIL LAWYERS
TAFT STETTINIUS & HOLLISTER LLP     Email: kwarren@mainsaillawyers.com
40 North Main Street, Suite 1700        319 W. Barbee Chapel Rd
Dayton, Ohio 45423                            Chapel Hill, NC 27517
Phone: (937) 228-2838                       Telephone: (919) 238-4000
Fax: (937) 228-2816                           Facsimile: (888) 501-9309
pepper@taftlaw.com

Counsel for Plaintiff Apex Tool Group, LLC

---

[2] Apex respectfully requests leave to amend if any additional pleading is required.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing "Plaintiff Apex Tool Group, LLC's Response in Opposition to Defendant Equipment Group Investments, LTD's Motion For Judgment On The Pleadings and/or Dismissal" with the Clerk of the Court using the CM/ECF system, which will notify the following of such filing:

Mark Allen Rubal
Waldron & Schneider, LLP
15150 Middlebrook Drive
Houston,, TX 77058
281-488-4438
Fax: 281-488-4597
Email: mrubal@ws-law.com

Counsel for Defendant Equipment Group
Investments, LTD

James Harry Lagos
Lagos & Lagos
One S Limestone Street,
Suite 1000
Springfield, OH 45502
937-323-5555
Email: jameshlagos@lagoscentral.com

Counsel for Defendant Equipment Group
Investments, LTD

Jose M. Lopez
Lopez, Severt & Pratt Co., LPA
18 East Water Street
Troy, Ohio 45373
T: (937) 335-5658
F: (937) 339-6446
jml@lsplaw.org

Counsel for Defendants, DMTCO, LLC,
Duane J. Newland,

Malcolm E. Lovelace and Tony A.
Stevens
J. Kellam Warren
Mainsail Lawyers
1340 Environ Way
Chapel Hill, North Carolina 27517
T: (919) 238-4000:
F: (888) 501-9309
kellam@mainsaillawyers.com

Counsel for Plaintiff Apex Tool Group,
LLC

This 22nd day of August, 2014.

/s/ Timothy G. Pepper
Attorney for Apex Tool Group, LLC